Good morning, Your Honors, and may it please the Court, I'm Corinne Bell, and I represent Appellant Robert Russell. With the Court's permission, I'd like to reserve five minutes for rebuttal. Under a straightforward application of controlling law to the undisputed facts, the District Court committed reversible error in its November 18, 2021, order imposing monetary remedies against Mr. Russell. As to both the disgorgement and civil penalties components of the order, the Court misapplied the applicable law and made numerous clearly erroneous factual findings. First, the District... Let's talk about the factual findings first. As I understand, as a part of the consent judgment, your client agreed that the SEC complaint should be deemed true for the purposes of determining disgorgement and civil penalties, correct? Correct. So everything that's in the SEC complaint is then true? Correct, for purposes of the monetary portion of the proceedings, yes, Your Honor. And there's nothing in this record that would indicate that SMRB generated any revenue? That's correct, Your Honor. So at this point, we're stuck with whether Lew is appropriately put together on this particular case. Is that what we're arguing about? Well, Your Honor, yes. Our position is that Lew controls the case. Well, it should. It's the Supreme Court case. Correct, Your Honor. And so the rule in Lew was that disgorgement is limited to a wrongdoer's net profits. And Lew required courts to deduct legitimate business expenses from the gains made from the wrongdoing when both the receipts and the payments are taken into account. Well, I read Lew. Did you read Lew on page 1945? Yes, Your Honor, I did. It says on page 1945, it appears that there's an exception to the argument you're making. And it says that if the entire profit of the business are undertaking results from the inflectivity, then the defendants will not be allowed to diminish the show of profits by putting in inequitable deductions. Your Honor, actually, at that part of the opinion, the court was quite clear that nonetheless, legitimate business expenses need to be... Well, I guess I'll have to understand what nonetheless means, because as I read, they laid out a pretty good idea of what disgorgement is. But they said at that point, and again on 1950, that there's one exception to this, and this is the exception we have in front of us, where there's nothing in this business that doesn't come from wrongful activity. And then at that point, the defendants will not be allowed to diminish the show of profits by any deductions. So at that point, it seems to me that the good district judge was pretty nice to your client and allowed your client deductions they would not... He would not have had to forgive your client, and instead said, well, guess what? Based on my discretion in these decisions, I'm going to take all those that they really apply to the business, and I'm going to let them deduct those. But those that just went off to their own and just helped them get a big yacht or go on vacation or buy a big car, I'm not going to do that. That's what he seemed to say. And it seems to me that Lew generally covers that. Your Honor, we would disagree with that. I guess, tell me the language that says that that's wrong. Yes. So it is true that the court held, as Your Honor said, that when the entire profit of a business are undertaking results from the wrongdoing, a defendant may be denied inequitable deductions, such as for personal services, but that... Inequitable deductions seems to cover a big yacht just as well as any other. Correct, Your Honor. And here it was undisputed that the yacht, and this is very important because this argument really is a red herring. It was undisputed in Russell's computations before the district court that the yacht was to be deemed an ill-gotten gain, not a legitimate business expense. It was never claimed as a legitimate business expense, and that that position is... Therefore, it never should have been taken as a subtraction from the amount that he fraudulently took from his investors. And it never was, Your Honor. And so therefore, then, he should disgorge the amount he got. No, Your Honor. That rule would contravene Lew. So what... Oh, Lew has those exceptions. That's why I'm putting you right on the exceptions. If I had to look at Lew in general and in total, I might go with you, but when I got to 1945 and again on 1950, I said to myself, there's an exception here. And the good district judge was doing all he could to get within that exception. And because your client agreed, never any revenue, agreed, all fraudulent, because that was in the SEC complaint, that was perfectly logical. And if Lew and if your client were to say, well, I used some of it for business, the district court could very easily say, I don't agree with that. And as a trier of fact, he said, no, I don't think so, and still disgorged. Your Honor, starting with Lew. What I'm going to do is put you in line with where I'm going. Yes, Your Honor. So Lew carved out absolutely no exception to the mandate that courts look at the ill-gotten gains as well as the legitimate business expenses tied to the wrongdoing and simply net to determine if there were net profits. Disgorgement is prohibited if that math does not net a profit to the wrongdoer. And the point that Your Honor is talking about, actually. Well, I think that's really hard to determine that what you're saying, that's the rule, when they laid out pretty much the law on the rule on disgorgement until they got to that page at 1945. And then they looked at other cases which were not in line with the cases that they had been citing about it. Let me ask you a question about this. Yes, Your Honor. So, I mean, I think your position as I take it is that there is this exception, but this exception is only for inequitable deductions such as for personal services, right? But it seems to me that the district court here, I mean, took a look at this yacht and was very incredulous about the fact that the yacht was somehow business related. And so, essentially did that. It refused to allow that as a deduction for personal services. So why would that not be allowed under Lew? Okay. So two points. One legal about Lew and one factual. So first and foremost, there is no exception under Lew. Lew mandates a very simple formula where you literally tally up the ill-gotten gains tied to wrongdoing and you tally up legitimate business expenses. Now, something like a yacht purchase when investor funds are diverted to a yacht purchase, that would not be a legitimate business expense. And that's how Lew deals with that. And at page 1950, that's what the court was talking about. The court was actually affirming this singular rule that even in the instance where you have where the entire profit of a business or undertaking results from the wrongdoing, still, still, you must tally up any legitimate business expenses spent on that enterprise. And the court was quite clear at page 1950 that this exercise requires ascertaining whether If the entire business was fraudulent, how could there be legitimate business expenses? So there's a distinction between saying that the entire profit of a business results from wrongdoing. In other words, here, where you have the only monies coming in were from the investors and then in addition, our client invested about a million dollars in his own money, including two years before his co-defendant ever got involved. That's a different situation where you have a legitimate business and there was no dispute that there was a legitimate business here. There was actually a cannabis company that our client invested money and time in building. So there was no dispute. It existed. However, at the end of the day, it was never profitable. And so when the only profits, the incoming monies, are tied to wrongdoing, then the court said that the defendant may be denied inequitable deductions, such as for personal services. And we see the court on remand in lieu going through just this exercise where the court is required to tease out in this instance where you have a real business, well, what's a legitimate business expense and what's an ill-gotten gain? But it seems to me that there's a cannabis company, which we see everywhere, but there's this whole scheme that seems somewhat independent from the cannabis company to get investors. And there's nothing about that that seems very legitimate, other than that that cannabis company works as a place to bring people to and be like, oh, look, we've got a storefront here. So under the way you're viewing it, you could somehow link a completely fraudulent scheme to some small hardware store or something like that and say, ah, now it's legitimate. Don't we need to look at the scheme that was challenged here and say that was illegitimate and everything related to that is illegitimate? You can't make something that's that illegitimate legitimate by adding some small little thing that's not related to the other part very much, right? So Your Honor, this would be precisely the factual determinations that the district court is required with making under lieu, where the court needs to look at what were the ill-gotten gains, the total of investor monies, and were there any legitimate business expenses? And in this instance, I just want to make two points before reserving the remainder of my time, if I may. First, here the SEC did not dispute before the district court and does not dispute on that Russell's legitimate business expenses exceeded the ill-gotten gains derived from his wrongful conduct. And the ill-gotten gains here, undisputably, undisputably in Russell's computations before the district court and in our position on appeal, that's never changed, included the monies that were diverted to pay for the yacht. On that point, I know your expert said they had spent $2 million in legitimate business expenses. What were the types of expenses? Was it to buy the marijuana? Was it to salaries? What were those expenses? Your Honor, in this instance, there were substantial investments made in the actual facilities, in addition to... The facilities to grow the marijuana? The actual, the structural facility and employees. This was not a situation where there was a finding that money was paid back to Mr. Russell. Again, Mr. Russell lost hundreds of thousands of dollars in his own money. And at the end of the day, specifically in the record sites, let me give the court the record sites, ER 32 and 87, this was the trial court proceedings. And that's where the SEC did not dispute that while Mr. Russell, they maintain Mr. Russell obtained the $2 million from investors, he spent $2.4 million on legitimate expenses. And we see that here again on appeal in the answering brief, pages 20 and 21. If I may reserve... Actually, can I ask another follow-up question? Is it actually pretty important? Because I want to hear the other side. Yes, Your Honor. I understand your argument, but it says here, it's true that when the, this is on page 1950, it's true that when the entire profit results from the wrongdoing, a defendant may be denied an equitable deduction, such as, right? So you can, you won't allow somebody to deduct something that's inequitable. Correct. It doesn't seem to me that Lew forecloses the idea. It would make logical sense that if you have no profit, you still would be denied inequitable deductions for personal services. So you couldn't, if you had no profit, it's still, I don't see anything in Lew that would say this, we're not going to let you, this was, this was money you scammed from people to buy a yacht. I mean, this is actually like a law school hypothetical, to buy a yacht, and we're not going to let you deduct that. It seems to me that language would allow you to do that. In other words, you're, you're basically saying once there's no profit, you don't get to, you don't get to deduct anything, but I don't, all this is saying that if there is a profit, you get to deduct inequitable deductions. Why wouldn't you be able to say, you're not, we're not going to let you offset anything with inequitable deductions, even if there isn't a profit? So Your Honor, if the, you simply look at the incoming money, right, that's the ill-gotten gains, and you look to see, first of all, were there any expenses? And if so, were these legitimate business expenses, or were things that would be, or are these things that would essentially be deemed not legitimate business expenses? And so Lew accounts for that scenario by saying, well, defendants are not going to be entitled for, to an offset if they pay themselves, for example, salaries that we deem, you know, quote, unquote, salaries that we deem not to be a legitimate business expense. Or buy themselves a yacht, you know, so, so. Or a car. But, but in this instance, again, what the scenario is, is that Mr. Russell paid more money into the business than he received from investors. My question is, if you do all that accounting, and the business lost money, let's say you have all this stuff going on, and the business lost money, but in addition to that, you also got a million dollars from investors and went and bought a yacht that you just partied on all the time, right, like completely for personal services, right? Then why would you, why would you not be able to say, you know, you might have lost money overall, you might have, you might have had a loss, not a profit overall, but you still got to give the million dollars back, you still got to disgorge the million dollars for this thing for personal services. You're saying you only have to disgorge that if your business made money. That doesn't seem to be what the logic of lieu is, necessarily. The rule, not only if your business made money. The touchstone is whether the wrongdoer made net profits. And so. That's what I mean. I mean, made money, made net profit is sort of, that's what I mean. And so this, importantly, changed the rule, and the prior rule in the Ninth Circuit, which was, as explained by the Berkeley case on reply at page seven, and this is what the court said, the court explained that prior to lieu, this court, the Ninth Circuit, permitted disgorgement by a wrongdoer of the entire amount obtained through conduct forbidden by the security statutes, reduced only by the amounts already paid back to investors. Lieu expressly rejected that standard, requiring that a disgorgement award under 15 U.S.C. 78 U.D. 5 not exceed a wrongdoer's net profits. And here again, we're dealing with undisputed facts that because of the money that Mr. Russell put into the business, he put in the amount equal to what he received from investors, which was the two million, plus hundreds of thousands of dollars more, again, undisputed that the total investments in the business were 2.4 million dollars. And so, in that scenario, lieu mandates that disgorgement is inapplicable, and the court's finding to... So just to be clear, I just want to be absolutely clear, because your position is you can never have disgorgement if you lost, when I say lost money, you didn't make a profit, you didn't make any net profit, then you can never have disgorgement even for things that were  No, your honor, absolutely not. Lieu accounts for that scenario by saying only legitimate business expenses, not any expenses. So the mere fact that you dissipate assets and the money comes in and you spend it all and you're left with nothing, that's insufficient. And the yacht is, in this case, is clearly a legitimate business case? No, your honor, again, Russell's position was always consistently, before the district court, the yacht was deemed an ill-gotten gain, an ill-gotten gain. Never a legitimate business expense. So that's a complete red herring, it's irrelevant here, because Russell never asserted in his mathematical computations that the yacht should be used as an offset. In fact, what happened is the money was diverted to the yacht, instead of coming into his personal bank account, and then he spent that money, an amount equal to that sum, and put it into the business. And so Lieu forecloses the notion that the routing of funds, in other words, whether that investor money came straight to him or went to the yachts, Lieu forecloses any sort of tracing argument, which is, in effect, what the SEC is advancing here. The SEC is saying, in effect, okay, well, if that $275,000 that was investor money diverted to the yacht, if that had come into his personal account, and if that had been spent on, then, legitimate business expenses, well then, that would count as an offset. But the routing of this money, the fact that it went to the yacht payment, and instead the money in his personal account, his own personal money, went in to pay legitimate business expenses, that's dispositive here. And Lieu totally rejects that concept and says, consistent with the well-established principle that money is fungible, that what the court's duty is to do at the district court level is to calculate all of the ill-gotten gains, and then look at the expenses. And that's where that line drawing comes in, and the district court needs to say, well, is this a legitimate expense, or is it an illegitimate expense? Here again, those facts were undisputed, undisputed that there were more in legitimate business expenses than in the ill-gotten gains. That's the difference between the $2 million figure that the SEC puts forth as the sum total of the ill-gotten gains, and the $2.4 million in undisputed, legitimate business expenses. Your Honor, for that reason, we would ask that the court reverse, and I would, if I could, still reserve at least a minute of rebuttal. You won't have your time, but we'll give you a minute for rebuttal. Thank you. So as I understand her argument, and I guess maybe if she gets back up again, she can correct me if I'm wrong. I understand her argument is, yes, my client got some money in from investors and essentially put it in his own pocket by buying this yacht for himself, and doesn't contest that this yacht was bought for himself. But then my client took at least that much money, more than that of his own money, and invested it in the company. And so essentially, she's saying that my client should get an offset, that Lew requires my client to get an offset. As long as the money he stole and bought a yacht with, he took at least that much money and put it into the company, then he should get an offset. So it's kind of, there's a little irony here, because she's saying that he should get an offset. He should get an offset, but the government shouldn't get an offset on the other side. What is your position on if somebody gets a million dollars, right, and they go out and they buy something personal with it, a really nice vacuum cleaner, but then they later put $1.5 million of their own money into this fraudulent scheme, then they should only, then stealing that $1 million, her position I think is that stealing that $1 million under Lew, they should still get an offset against the gains in order to figure out what the net profits are. Am I understanding that correctly, is it or not? Yeah, I mean, I think the best way to tackle that question is to take on this idea that there's indisputably $2.4 million in legitimate business expenses. Russell was arguing that the district court erred because that is indisputed and that that amount should offset his gain, but Russell's incorrect, and his position on appeal ignores that based on his admissions and the complaint of Judge Smith alluded to, he in fact had no legitimate business expenses. If I can stop you there, the problem here with the district court's opinion is it doesn't address that at all, so we don't know exactly what the district court was doing. Did the district court actually reject the expert report saying there were $2 million in legitimate business expenses? I mean, just looking at the opinion, we just don't know what the district court did. If it rejected it, then, you know, I think that's, you know, stronger ground, but we just don't know what the district court did here. And I think the district court's opinion is helpful in that respect. The SEC and the district court certainly reiterated that Russell had agreed in the consent order to the allegations in the complaint, including numerous allegations that I could walk through about how this is a sham transaction and he never conveyed any interest in the company to the investors, and then the court obviously heard testimony from Russell and from his accountant, and at that time, Russell repeatedly argued that the yacht should be deducted from the $2 million as a legitimate business expense. The district court rightly rejected Russell's argument, finding that yacht payments cannot plausibly be characterized as a legitimate business expense, and with that finding, and The court acted well within its discretion when it concluded that the commission had set forth a reasonable approximation of Russell's ill-gotten gains of $275,000. Now the SEC did not take a maximalist position in the district court. It took a middle ground position. This case was somewhat soon after the legal decision had been issued and opted to allow a credit of about $1.7 million on the $2 million that Mr. Russell had received, but stopped at the yacht and said, you know, that amount is not going to be disclosable, and if you look at the language in the district court's own briefing, it said that Mr. Russell may have legitimate business expenses up to a certain amount, and then it referred to the purported interest that he had conveyed to investors. And so the SEC went up to a certain point in the district court with respect to the relief that it sought to disclosement. It did not seek, it did $2 million in disclosement from Mr. Russell, although it could have under Liu and under Yang, this court's decision on Yang, as well as the Fifth Circuit's decision in Hallam. Because... But I guess that still doesn't address, you know, the merits of Mr. Russell's argument that he had $2 million in legitimate business expenses. I mean, I appreciate district courts are, you know, they're much busier than we are and they have a much tougher job, but the opinion itself just doesn't address that. So other than it was a reasonable approximation, but I mean, I know we give deference to the district court's findings, but we just don't know what happened here, how the district court came to that. Well, I think that we do know because the district court agreed with the SEC's assessment that it was a reasonable approximation of the gain. And it's important to note that although... Not only that, but the district court had in front of it at the time, that's why I kind of took that up with counsel, the admonition, admission, not admonition, but admission by the plaintiff that the complaint was true for all purposes. And the district court, therefore, could rely on it without stating it again in its decision, couldn't it? Yes, Your Honor. And I'd like to add that the district court was, excuse me, that the burden rests on Mr. Russell to refute the SEC's reasonable approximation of ill-gotten gains, as this court has said many times, as well as in platform wireless, for example. And in addition to having that burden, this court has said and instructed that in determining the disgorgement amount, the risk of uncertainty falls on the wrongdoer whose illegal conduct created that uncertainty. And the district court's opinion does cite to that language. And so in this case, Russell kept no record. There's no record of investors' identities, how much they invested, or what they purportedly purchased. There's no record of any distributions, interest, or principal that was paid back. There's no mention of investors in SMRBs, financial statements, account books, or tax returns. Russell commingled investor funds with his personal funds and kept no record of how those funds were spent. And he testified that he can't be sure how much he spent on SMRB expenses. So it's reasonable to read the district court's opinion as drawing those uncertainties against Mr. Russell that he created in accepting the SEC's reasonable approximation of the ill-gotten gains. And if I could just walk through some of the admissions in the complaint that Mr. Russell has admitted to, he admits that he was legally barred from selling any interest in SMRB to investors without proper approval, which he did not have. He admits that he had entered into SAM transactions in which he transferred fictitious worthless securities to investors, and that in doing so, he never actually conveyed any ownership stake in SMRB to those investors. And as a result, Russell admits, and this is in paragraph 73, that he and Griffith were the sole beneficiaries of any and all money that he spent on SMRB. None of it benefited investors. Was that based more on technicality rather than substance? That is, I mean, was this a case of Mr. Russell and his conspirator saying, we're going to keep everything to ourselves, or was it they just didn't follow the rules, so the legal effect was they never actually conveyed interest to investors? I mean, I think there is somewhat of a difference, I think, between the two in saying whether something was kind of legitimate or completely illegitimate. I don't think that this is a technicality. Every dollar, there's no way the investors could ever benefit from any of the expenses that was spent. As a legal matter, but were they trying to do that? So I understand, for example, they didn't get the regulatory approval for the marijuana business, it really couldn't succeed. But that's different from someone just saying, I'm going to build a marijuana business doing nothing and just collecting the money and, you know, taking it away. And that kind of goes to our earlier discussion of is this a completely illegitimate business or semi-illegitimate business? I think this is a completely illegitimate business as far as the determination of whether there are any legitimate business expenses. You can look at the Hallam case from the Fifth Circuit, which said that it was rejected any offset for expenses that were incurred in, I believe, it was a mining company or electrical company, excuse me. And the court said that because every securities transaction was unlawful, every receipt of investor funds was a, excuse me, every alleged expense was not eligible as a legitimate business expense because every transaction was unlawful. And this court in Yang reiterated that allows certain offsets of, excuse me, the second time that Yang came before the court, allows certain offsets of legitimate business expenses. Yang 2, right. Yes, Yang 2, because exclusively carved out, this was not a, in Yang, a Ponzi scheme or a situation where they were just taking investor money. And this court, the second time in Liu 2, highlights the language from page 1950 of the Liu decision, which says that the determination of whether you can deduct a business expense on whether there's any value to the investors independent of the fraudulent scheme. And in that case, in Yang and in the second Liu, there was some little bit of value, potentially for those investors to get their EB-5 visa. That's not the case here. If I can interrupt you here, you had mentioned Hallam, so I want to raise this question. I know it wasn't briefed before us or raised at the district court, but Hallam discusses this. Liu discussed 78 U.D. 5, which was about equitable powers, disgorgement under equitable powers. But then, since then, Congress enacted 78 U.D. 7, which explicitly mentions disgorgement. I mean, does the SEC have any views on whether it's relying on either or what the interaction is between the two? I know Hallam raised this issue, and I know you guys didn't brief it, and if you're not prepared to answer, that's fine, but I want to know if you have any views on that. No, I understand, Your Honor. We did not brief this issue, and I looked at the papers on this, and there was not a joint provision cited. I think it's fair to assume that because we were relying, and the district court was relying on Liu, and Liu is really a D-5 case, that the SEC was looking at D-5, and you would have to infer that D-5 was the underlying. In new cases now, has the SEC taken any position on, you know, is it D-5, D-7, you know, what its powers are? Has it taken any official position in other recent cases? Yes. There was a case argued recently where there was a dispute, I suppose, regarding whether the disclosure that was sought under D-5 were D-7. I believe that was in the Second Circuit, but that turned on, there were some timing issues in that case as far as when the relief was sought, and I don't remember all the details, but there was a Second Circuit case where that issue was briefed. May I change the emphasis here for a minute? It seems to me you've pretty much argued about this, but it's worrying to me about the abuse of discretion in imposing the civil penalty within the statutory range. It was, the penalty was, did not exceed the statutory maximum, it doesn't exceed the amount of gain, but in determining about civil penalties, in general, one discusses the Murphy factors. There's no discussion of Murphy factors here. District Court didn't talk about the Murphy factors. I mean, I was a district judge, and I know we have to put those Murphy factors to use. So, what am I supposed to do, send this back to let him think about the Murphy factors? No, Your Honor, the District Court, let me first say, there's no dispute in this case that a third-tier civil penalty is warranted. The parties agree, they don't dispute that under that section of the code, that there was fraud and deceit, and there was substantial losses, so the statutory threshold for imposing a third-tier civil penalty is met. And so, but remand is not necessarily a warranted... Once meeting that, the penalty, once saying it fits in the third tier, then it's totally in the court's discretion to decide what to do. And at that point, we've said the Murphy factors are the place to start and use, and then you come up with something worthwhile. I didn't see that here. What do I do with that? I would look at the Yang decision, Your Honor. In the Yang, the first Yang decision, this court did remand, but that was because the District Court provided no explanation at all. And so in Yang, this court said... There's some explanation here, but it doesn't seem Murphy factors-oriented at all. No, but if you look at the Yang decision, the District Court, they reversed because they said there was no explanation of the Murphy factors or rationale provided. And the District Court certainly provided its rationale in this case. It described the substantial investor losses. It discussed the relative culpability of the defendants. And then it adjusted, it decreased the civil penalty amount from what the SEC sought based on trying to see the proportionality as to the disgorgement amount. And this case has, on multiple occasions, in the Global Express case as well as the District Court decisions imposing civil penalties, so long as they met the statutory requirement that the court assess and discuss the facts and circumstances in the case. That's what the statute requires, and that's what the District Court did satisfy in this case. This is not... So we've got a new standard instead of Murphy, totality of the circumstances? Well, Murphy, if you look at it, it is a case about permanent injunctions. And so if you look at the Murphy factors, there is a bit of an ill fit as far as the applicability to civil penalties, but the SEC is not arguing that this panel upend or take a strident position in that regard. We're only saying that the District Court was within its discretion in filing, and it did meet the statutory standard, that this court has never imposed Murphy as a straitjacket on District Courts who want to determine civil penalties, and that allowing that leeway is consistent with the general discretion that we afford District Courts in determining civil penalties. And I just wanted to say, I believe the name of the case where D-5 and D-7, because I don't know if I got the circuit right, I think the name of it was Govel, G-O-V-I-L, and if there's no further questions, Your Honor, we request that the court affirm the decision below. Govel or Gault? G-A-U-L-T. Great. Thank you. It wasn't my case. I'm just trying to... Your Honors, going back to Lou, I don't understand the SEC to dispute the proposition that the and to get back to Judge Smith's concern about the language in Lou. What Lou says specifically is that the exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains under another name. The result of that analysis was undisputed by the SEC below. That's where you get the 2.4 in legitimate expenses. And it was undisputed before this Court. What I understood the SEC to argue for the first time now is that somehow there weren't 2.4 million dollars in legitimate expenses. The SEC has waived that argument, and that's at the pin sites previously provided, including the answering brief at 20 and 21 and the trial proceedings below at E.R. 32 and 87. In terms of the civil penalties component of the order, Your Honor is absolutely correct that the court misapplied the law and premised the civil penalty. You don't have a case. You didn't cite one in your brief, and you don't have one that says that I have to apply the Murphy factors. I went to find one. You didn't cite me one, so I had four law clerks working hard to find one, couldn't find one. It seems to me that it's left in the open, that all we have to do is somewhat, as the government has argued, the totality of the circumstances is the situation as long as it has been explained. Yes, Your Honor, and the problem here at a minimum was the court did not explain its penalties on the wrong standard, which was investor loss rather than punishment. And we also know, and it's the Yang case that we cite, that the way the Ninth Circuit courts typically apply the assessment of the facts and circumstances of the case to determine whether punishment, civil penalties for the purpose of punishment, is warranted is pursuant to the Murphy factors. And so that's what's typically done, and the court at a minimum needs to explain its work. And for these reasons, we would ask that the court vacate the order. Our position is that the court should find that disgorgement and prejudgment interests are inapplicable. However, if Your Honor believes that the court did not explain its work, then that would warrant a remand on the disgorgement portion. And certainly as to the civil penalties portion, our position is that the order should be vacated and remanded with an order that the district courts determine whether civil penalties are appropriate, and if so, the amount based on the facts and circumstances of the case, rather than the improper purpose of disgorgement, essentially, which was articulated, including the factors set forth in Murphy. Thank you. Thank you. Thank you, Your Honors. Thank you both for a helpful argument. The case has been submitted.
judges: SMITH, LEE, VANDYKE